# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

MICHAEL CHRISTOPHER STOFFA,

      Petitioner,

v.                                          Action No. 2:16cv207

JEFFREY KISER,
Warden Keen Mountain Correctional Center,

      Respondent.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      This matter is before the Court on Michael Christopher Stoffa's ("Stoffa's") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, ECF No. 1, and the respondent's motion to dismiss, ECF No. 5. This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Local Civil Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. For the following reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 5, be **GRANTED**, and the petition for a writ of habeas corpus, ECF No. 1, be **DENIED** and **DISMISSED WITH PREJUDICE**.

### I.    STATEMENT OF THE CASE

**A.    Procedural Background**

      Michael Stoffa is in state custody pursuant to a final judgment entered in the Circuit Court for the City of Newport News ("trial court") on August 19, 2011. Following a bench trial,

the trial court convicted Stoffa of second degree murder and two counts of felony child neglect. ECF No. 7-1. Stoffa was sentenced to serve 40 years in prison for second degree murder and a consecutive 20 years in prison for two counts of felony child neglect (10 years for each count). *Id.* Stoffa directly appealed his conviction and sentence to the Court of Appeals of Virginia, which denied the appeal on April 5, 2012. ECF No. 7-3. The Supreme Court of Virginia refused Stoffa's appeal on August 7, 2012. ECF No. 7-4 at 1. On August 16, 2013, Stoffa filed a petition for a writ of habeas corpus in the trial court alleging:

1. He was convicted and imprisoned in violation of his Eighth Amendment and due process rights because he is actually innocent of all charges.

2. Trial counsel was ineffective under the Sixth Amendment for failing to present evidence that would have proved his innocence.

3. Trial counsel was ineffective for failing to object, on Sixth Amendment Confrontation Clause and Virginia evidentiary law grounds, to hearsay testimony by the Commonwealth's medical experts.

4. Trial counsel was ineffective for failing to consult or obtain a qualified medical expert.

ECF No. 1-4 at 34-49; ECF No. 1-5 at 1-30. The state habeas court dismissed Stoffa's actual innocence claim after finding that it could not be litigated in a state habeas corpus proceeding and dismissed Stoffa's ineffective assistance of counsel claims after finding that they did not meet the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). ECF No. 7-5. Stoffa appealed the decision to the Supreme Court of Virginia, which found no reversible error in the judgment on June 2, 2015. ECF No. 7-7.

Stoffa then filed a federal petition for a writ of habeas corpus, his first, on August 24, 2015, asserting that counsel provided ineffective assistance by:

2

1.      Failing to properly object to crucial inadmissible portions of the
testimony of the Commonwealth's two principal medical experts
under the Confrontation Clause and Virginia evidentiary law; and

2.      Failing to consult with and engage a qualified medical expert.

ECF No. 1. On October 26, 2015, respondent filed a Rule 5 answer and motion to dismiss the petition. ECF Nos. 5-7. On November 16, 2015, petitioner responded to respondent's motion to dismiss. ECF No. 8. Accordingly, this matter is ripe for review.

**B.      Statute of Limitations**

Stoffa timely filed his petition with this Court before the applicable statute of limitations deadline passed. Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), section 2254 petitioners are subject to a one-year statute of limitations, which begins to run from "the date on which the judgment became final by the conclusion of direct review." 28 U.S.C. § 2244(d)(1). This time period tolls when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" is pending. 28 U.S.C. § 2244(d)(2).

Stoffa's conviction became final on November 5, 2012, 90 days after the Supreme Court of Virginia refused his direct appeal on August 7, 2012, and the time to appeal that order to the United States Supreme Court expired. *See* Sup. Ct. R. 13.1; *Harris v. Hutchinson*, 209 F.3d 325, 328 n.1 (4th Cir. 2000) ("[T]he time for seeking direct review of [the] state-court conviction was concluded . . . when the period for filing a petition for a writ of certiorari in the United States Supreme Court expired."). Under section 2254, Stoffa had until November 5, 2013 to file his habeas petition in this Court. However, the limitations period tolled for 655 days from August 16, 2013, the date when Stoffa filed his state habeas petition in the trial court, to June 2, 2015, when the Supreme Court of Virginia dismissed his petition. *See Lawrence v. Florida*, 549 U.S.

327, 334-36 (2007) (holding that petitioner was not entitled to tolling for the additional 90 days to file a petition for writ of certiorari to the United States Supreme Court following state collateral review). In Stoffa's case, therefore, the statute of limitations expired on August 24, 2015. Stoffa filed his habeas petition in this Court on August 24, 2015, just inside the one-year statute of limitations prescribed by AEDPA.

## C.    Exhaustion of Claims in State Court

Section 2254 petitions challenge a state's custody of a prisoner on the theory that his custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, before the Court may reach the merits of a petition, all grounds must be exhausted. 28 U.S.C. § 2254(b); *see also Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir. 1998). Exhaustion requires the petitioner to present the same "essential legal theories and factual allegations advanced in federal court" first to the highest state court. *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. 1991) (citing *Johnson v. Allen*, 344 U.S. 443, 447 (1953)); *see also Skipper v. French*, 130 F.3d 603, 610 n.4 (4th Cir. 1997). This requirement may be satisfied through direct appeal or post-conviction proceedings. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). Stoffa properly exhausted his claims by appealing the state habeas court's final order to the Supreme Court of Virginia. ECF No. 7-7.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Facts of the Case

According to the Court of Appeals of Virginia, the facts of Stoffa's case are as follows:

Stoffa and Lillian Callender ("Callender") began dating in February 2009. In November 2009, Stoffa and Callender went to Trinidad and picked up Callender's daughters, A.C. and Y.C., who were living with a relative, and brought them back to the United States of America to live with them at Stoffa's apartment. At that time, A.C. was fourteen months old and Y.C. was twenty-four months old.

4

On March 1, 2010, Stoffa, Callender, and the children went to Hooters for dinner. Taelor Chavful, their Hooters waitress, noticed "a bunch of bruises" on Y.C.'s face and observed that both children were lethargic and hardly ate anything. After dinner, the group went to Wal-Mart where a security camera recorded A.C. falling down twice while holding on to the side of the shopping cart near the self-checkout, after which Stoffa picked her up. When they returned to the apartment, Stoffa noticed A.C. had stopped breathing around 10:00 p.m., so he called 911. He then drove A.C. to the emergency room at Mary Immaculate Hospital because he figured they could get her there faster than an ambulance would be able to.

At the hospital, Dr. Thomas Henderson received A.C. and stated that A.C. was critically ill and lifeless on arrival. While trying to resuscitate A.C., Dr. Henderson spoke with Stoffa in an attempt to understand the events leading up to A.C.'s admittance into the emergency room. Stoffa told Dr. Henderson that A.C. had vomited a few times and that she had vomited again when they were out at dinner. Stoffa also told Dr. Henderson that the symptoms had started a day or two earlier and that she just collapsed on him that day. When asked by Dr. Henderson regarding the bruises on A.C.'s face, Stoffa stated that she had swallowed some shampoo or soap and he had to pull A.C.'s mouth open to keep her from swallowing her own tongue.

Officer Benjamin Nicholson, with the Newport News Police Department, was called to the hospital regarding possible child abuse involving an infant who was not breathing when she was brought into the emergency room. Upon arrival, Officer Nicholson went to the trauma room where A.C. was located and observed that she had bruising on her forehead and jawline that varied between light green and purple as well as bruising on her back, torso, arms, and thighs. Officer Nicholson also saw Y.C. and noticed that Y.C. had two "blackened eyes," "deep-set bruising on the bridge of her nose," and bruising along her jawline. Officer Nicholson, however, did not see the injury on Y.C.'s left ear as her hair covered her ears.

After various unsuccessful attempts to revive A.C., Dr. Henderson transferred her to the Portsmouth Naval Medical Center, which has pediatric intensive care capabilities, sometime after midnight. Dr. Darcy Michelle Durbin, a pediatric critical care physician, received A.C., who was comatose, and administered a "Brain Death Exam" around 2:00 p.m. on March 2, 2010. A.C. failed the exam, so Dr. Michael Strunc administered a second "Brain Death Exam" on March 3, 2010. Dr. Strunc verified that A.C. failed the second exam and declared her dead at 8:15 a.m.

. . . .

5

At trial, Detective A.C. Schraudt, with the Newport News Police Department, testified that he had also been at Mary Immaculate Hospital on March 2, 2010, with regard to the possible child abuse report. He spoke with Stoffa on that day who informed him that he never spanked the children. During another interview . . . Stoffa denied any spanking or physical punishment. Then, in yet another interview, Stoffa stated that they initially paddled the children, but stopped when it left welts on the children. Stoffa also admitted to Detective Schraudt that he had anger management problems.

During a third interview with Detective Schraudt, Stoffa stated that he thought Y.C.'s bruises came from one evening when she kept pushing his buttons by faking having to go to the bathroom. He stated that he picked her up and threw her from the bathroom to her bedroom, which was approximately six feet [away], where she landed on a pile of LEGOs. Stoffa also admitted to throwing the children onto the couch or forcefully grabbing them at times when attempting to place them in time-outs.

Detective Schraudt also testified that Stoffa changed his story regarding the bath soap incident during several interviews. Stoffa initially told Detective Schraudt that Y.C. pulled the towel out from under A.C. causing her to fall to the floor. Then, in a subsequent interview, Stoffa stated that he knocked Y.C. over on his way to A.C. and that he then picked A.C. up off the floor, placed her on the couch, and pried her mouth open when he noticed that she was biting her tongue. At that point, A.C. became unresponsive, so Stoffa grabbed her by the shoulders and gently shook her about ten times. A.C. opened her eyes but then faded again, so Stoffa "shook her again another five times." Stoffa admitted that it was possible that he shook A.C. as hard as he would have shaken an adult. Stoffa further admitted that he did not seek medical treatment for A.C. after she temporarily became lifeless.

Later in the same interview, Stoffa indicated that the children's bruises were more than likely caused by him and admitted to force-feeding the children when they did not want to eat. Stoffa demonstrated that he would force-feed the children by forcing food into their mouths, putting his hands around the jaw and face area, and holding their mouths shut until they chewed the food. Detective Schraudt testified that during this interview, Stoffa stated, "I am completely responsible for what happened to [A.C.]. Instead of making her healthy, I made her a vegetable." Then in response to Detective Schraudt's question of whether Stoffa caused the injuries to A.C. and Y.C., Stoffa replied, "I know I am responsible. I am guilty." Stoffa also admitted that he did not give the children the medical care when they needed it, even though Callender had wanted to, and then told Detective Schraudt that the children would have been better off in Trinidad and to have never known him.

> In one of his final voluntary interviews at the police station with Detective Schraudt, Stoffa stated that he had done the "shaken baby" to A.C. when she was sick in an attempt to save her life.   Stoffa also stated "[e]verything was preventable. It was abuse. I will be the first to admit it was abuse."  In addition, Stoffa admitted that he acted out in anger with the children and that the spankings, slapping, and throwing were wrong and had to stop.

ECF No. 7-3.

The state called two experts to testify at trial.  The first was Dr. Wendy Gunther, M.D., the assistant chief medical examiner for the Commonwealth of Virginia and a board certified anatomic, clinical, pediatric, and forensic pathologist.  Trial Tr. 172:17-173:8.  Dr. Gunther performed an autopsy on A.C., on March 5, 2010, and testified at trial about her findings.  Trial Tr. 173:23-174:4.  Dr. Gunther attested that A.C.'s autopsy revealed extensive, overlapping bruises on A.C.'s head, face, ear, and back.  Trial Tr. 175:4-178:9.  She also discovered abnormalities in A.C.'s internal structures and organs, including infected lungs, separation of the skull bones encasing the brain due to swelling of the brain, and an extensive subdural hematoma (a collection of blood between the membrane of the brain and the brain itself).  Trial Tr. 178:10-179:7.   Dr. Gunther explained that during A.C.'s eye exam, she found extensive retinal hemorrhages[1] (places where bleeding is accumulating underneath the retina), as well as evidence of old blood in the optic nerves and in the backs of A.C.'s eyes.  Trial Tr. 183:11-184:11.  These findings led Dr. Gunther to the conclusion, based on a reasonable degree of medical certainty,

---

[1] In his brief, Stoffa reports that "Dr. Gunther improperly recounted the findings and opinion of the *non-testifying neuropathologist regarding retinal hemorrhages* and brain injury" in conjunction with identifying the cause of death as inflicted brain injury.  ECF No. 1 at 28 (emphasis added).  Review of the testimony, however, reveals that Dr. Gunther was testifying about her own findings of retinal hemorrhages based upon her own examination of A.C.  *See* Trial Tr. 183:11-184:11 (discussing her examination of A.C.'s eyes), 187:11-188:12 (discussing photos she took while examining A.C.'s eyes that show hemorrhaging).

that inflicted brain injury/abusive head trauma[2] caused A.C.'s death. Trial Tr. 188:18-189:2. She also opined that the shaking-type episode that caused A.C.'s death possibly occurred three to six days before A.C. entered the hospital; however, she could not offer an exact time. Trial Tr. 193:9-18. Dr. Gunther also identified medical neglect as a contributing factor to A.C.'s death. Trial Tr. 193:19-23.

Dr. Gunther testified that she utilized two reports, one by a forensic anthropologist and one by a neuropathologist, in creating her own report.[3] First, Dr. Gunther stated that she removed bones from A.C.'s skull and left forearm (that she identified as "abnormal"[4]) and sent them to a forensic anthropologist with a request for analysis. Trial Tr. 180:3-6, 181:6-13. At this point in Dr. Gunther's testimony, trial counsel made a hearsay objection, which he did not renew after the Commonwealth's attorney clarified that Dr. Gunther used the report of the forensic anthropologist to "formulate her own findings in this case." Trial Tr. 180:7-20. Dr. Gunther explained that she communicated with the forensic anthropologist by phone and email, reviewed the forensic anthropologist's report and photographs, and used the forensic

---

[2] This label encompasses shaken baby syndrome and shaken impact syndrome. Trial Tr. 188:24-25.

[3] The reports of the forensic anthropologist and the neuropathologist were not admitted into evidence. Dr. Gunther's report was received into evidence.

[4] In discussing these bones and the work of the forensic anthropologist, Stoffa suggests that Dr. Gunther failed to make any pertinent observations about the bones on her own. ECF No. 1 at 22 ("the findings of the non-testifying forensic anthropologist provided an essential link in Dr. Gunther's testimony between observational evidence *that she herself did not observe* and her conclusion that severe intentional abuse was the cause of A.C.'s death") (emphasis in original). Dr. Gunther's testimony, however, reveals that, while conducting the autopsy, she observed that a portion of the skull and the bones in the forearm were "abnormal," so she removed and sent them on for further analysis. Trial Tr. 180:3-5, 181:3-13. Also, Dr. Gunther testified about the abnormal appearance of the skull bone, as shown in photographs taken during her autopsy examination. Trial Tr. 184:15-185:17 (discussing photographs, including one depicting "discoloration of the parietal bone").

8

anthropologist's report in creating her own report. Trial Tr. 181:6-13. Specifically, Dr. Gunther testified that she "utilized that report in creating my own report." Trial Tr. 181:9-13. Dr. Gunther testified that the forensic anthropologist found three areas on the right parietal bone (located on the skull) that were discolored and porous. Trial Tr. 181:17-22. The forensic anthropologist described these areas as reactions to old trauma or infection due to trauma or simply infection. Trial Tr. 181:25-182:1. Having considered the forensic anthropologist's description, Dr. Gunther herself then opined that the abnormalities were reactions to head trauma because, she explained, skull infections are extremely rare without a predisposing cause and she found no predisposing cause. Trial Tr. 181:22-182:1. Dr. Gunther subsequently described, without referencing the forensic anthropologist's analysis, an area in A.C.'s left forearm (namely, the other set of bones that Dr. Gunther removed) that revealed one old fracture, one newer fracture just beginning to heal, and metaphyseal fractures that were just beginning to heal. Trial Tr. 182:2-13. Dr. Gunther identified the metaphyseal fractures as characteristic of child abuse. Trial Tr. 182:5-6.

Second, Dr. Gunther testified that she also consulted with and considered the report of a neuropathologist, in reaching her conclusion that A.C.'s brain showed evidence of shaking-type episodes consistent with abusive head trauma. Trial Tr. 189:12-14. As was the case with the suspect bones noted above, Dr. Gunther testified that, after examining the skull, she removed and examined the brain and sent it to a neuropathologist for further examination. Trial Tr. 179:8-13. Dr. Gunther stated she utilized the neuropathologist's report in a manner similar to her use of the forensic anthropologist's report (that is, she communicated by email and phone, reviewed the report, and used it in creating her own report). Trial Tr. 181:6-13. At some point in this process, Dr. Gunther also reviewed slides apparently containing samples of A.C.'s brain tissue. Trial Tr.

9

179:11-13.   Dr. Gunther explained that together[5] she and the neuropathologist identified evidence of abusive head trauma in the brain, including subdural hemorrhage (gathering of layers of blood in the brain), a subarachnoid hemorrhage, global hypoxic-ischemic changes (lack of oxygen to the brain), and ruptured axons (an injury typical of acceleration and deceleration due to violent forces).  Trial Tr. 189:19-191:17.

The state also presented the expert testimony of Dr. Michelle Clayton, M.D., a child abuse pediatrician responsible for evaluating cases of suspected child abuse or neglect at the Children's Hospital of The King's Daughters Child Abuse Center ("child abuse center").  Trial Tr. 206:22-207:16.  Dr. Clayton testified that she supervised Dr. Verena Wyvill, a fellow receiving advanced training at the child abuse center, in her review of A.C.'s case, by evaluating all photographs that Dr. Wyvill obtained during A.C.'s autopsy and any photographs provided by investigators, observing A.C.'s autopsy via video, reviewing Dr. Wyvill's report, and editing and revising its conclusions.  Trial Tr. 208:15-209:2.  Dr. Wyvill's report was not admitted into evidence.

During her testimony, Dr. Clayton defined inflicted traumatic brain injury as a condition that results "when a child has violent trauma applied to their head, their brain bounces off the inside of their skull, twisting and shearing on itself, which causes widespread damage to the cells of the brain that make up the brain itself."  Trial Tr. 209:19-24.   Such damage, Dr. Clayton explained, can cause "widespread and severe swelling," blood flow restriction, and skull and brain separation.  Trial Tr. 210:23-211:8.  Dr. Clayton stated that 75-80% of children with traumatic brain injury survive with medical attention.  Trial Tr. 220:8-20.  She noted that medical

---

[5] Dr. Gunther uses the word "we" throughout when discussing the findings from A.C.'s brain examination.

experts treat children with traumatic brain injury by intubating them to regulate breathing, administering medication to reduce brain swelling, and inserting IVs to manage blood pressure. Trial Tr. 218:10-219:14. Dr. Clayton specified that she would expect radiologic findings to show blood around the outside of the brain (subdural hemorrhages) and swelling. Trial Tr. 214:20-215:13. Dr. Gunther testified that A.C.'s autopsy showed both of these findings. Dr. Clayton's testimony also established a link between the retinal hemorrhaging that Dr. Gunther found and inflicted traumatic brain injury. Trial Tr. 215:14-216:19. Dr. Clayton explained that abusive head trauma is the only known cause of widespread and severe, multilayered retinal hemorrhages. Trial Tr. 216:20-217:24. She also confirmed that A.C.'s injuries, including her bruises, retinal hemorrhages, and subdural hemorrhages, were not at all consistent with accidental injury (such as falling off the couch, falling on LEGOs, falling while running), ingestion of soapy bath water, or the performance of CPR. Trial Tr. 220:21-223:9, 223:20-224:2-7, 226:24-227:16, 232:12-21. Dr. Clayton ultimately offered the opinion that A.C.'s injuries were "diagnostic of multiple episodes of blunt force trauma inflicted on those body regions." Trial Tr. 223:17-19.

**B. Standards of Review**

**1. Deference to State Court Decisions**

The parties dispute the standard of review the Court should apply to this case. Stoffa argues for *de novo* review. ECF No. 1 at 16. Respondent contends that the highly deferential standard in section 2254, as amended by AEDPA, is appropriate. ECF No. 7 at 15. The standard set forth in section 2254, which prohibits the Court from granting relief unless the decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable

11

determination of the facts in light of the evidence presented in the State court proceeding," applies only when the state court's decision qualifies as an adjudication on the merits. 28 U.S.C. § 2254(d)(1)-(2). A petitioner's claim is not "adjudicated on the merits" if the state court bases its decision on a "materially incomplete record." *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (citing *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010)). The record may be materially incomplete if a state court "unreasonably refuses to permit further development of the facts of a claim." *Id.*

Stoffa argues that the state habeas court did not adjudicate his claims on the merits because it denied his requests for discovery and an evidentiary hearing after he alleged new facts and submitted an expert affidavit to prove his claims. ECF No. 1 at 16. In support, Stoffa cites to *Gordon*, 780 F.3d at 202, a case in which the petitioner alleged his counsel was ineffective for failing to file a notice of appeal and failing to consult about an appeal. *Id.* at 199. The outcome of the case turned on a credibility contest between Gordon, who asserted that he asked counsel (orally and in writing) to file an appeal, and counsel, who denied ever receiving an explicit request. *Id.* at 203. Respondent's evidence included an affidavit from counsel contending that Gordon never expressly asked for an appeal. *Id.* at 203. In his *pro se* petition, Gordon claimed that he did request an appeal. *Id.* Gordon also claimed, in an affidavit, that he asked counsel "is there anything else we can do from this point and [counsel] just simply shook his head in a no position." *Id.* The state court disregarded the statements in Gordon's petition and considered only his affidavit in determining that no conflict existed between Gordon's and counsel's version of events. *Id.* at 202. Emphasizing the lower standard of legal draftsmanship applicable to *pro se* habeas petitioners, the Fourth Circuit found that the state court erred in focusing "on one line in Gordon's affidavit, while ignoring Gordon's allegations in his papers that he asked [counsel]

12

to file an appeal" instead of holding "an evidentiary hearing to develop the record and resolve this credibility contest." *Id.* at 203. Due to this error, the Fourth Circuit held that "the state court did not adjudicate Gordon's claim on the merits, and the district court owed no deference to the state court's ruling." *Id.* at 204.

Respondent counters that the facts and circumstances of *Gordon* differ from those in the present case. ECF No. 7 at 15-18. The Court agrees. Unlike the court in *Gordon*, which ignored Gordon's claim that he asked counsel to file an appeal, the state habeas court here evaluated Stoffa's expert affidavit when applying the *Strickland* standard. ECF No. 1-1 at 29-31. In light of the other evidence, including Stoffa's inconsistent statements and admissions to the police, the state habeas court found that Stoffa was not prejudiced by trial counsel's failure to engage this expert. *Id.* The state habeas court's refusal to grant an evidentiary hearing to facilitate discovery does not necessitate *de novo* review. In *Wilson v. Sirmons*, the Court clarified that *de novo* review does not apply "every time the state court declines to hold a hearing on a defendant's evidentiary proffer." 536 F.3d 1064, 1079 (10th Cir. 2008). Instead, when a state court evaluates "the non-record evidence in its denial of [petitioner's] *Strickland* claim and his request for an evidentiary hearing," AEDPA's deferential standard should apply. *Id.* Although Stoffa contends "[t]here is no evidence that the state habeas court read the opinion drafted for it by counsel from the Warden, let alone Stoffa's expert affidavit," ECF No. 8 at 8, the Court finds such an assertion baseless, particularly since the state habeas judge signed the opinion in question. The state habeas court adjudicated Stoffa's claims on the merits, and the Court will apply AEDPA deference.

Under AEDPA's deferential standard, the Court cannot grant relief unless the state court's decision (1) was "contrary to, or involved an unreasonable application of, clearly

13

established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A state court decision is "contrary to" clearly established federal law when a state court arrives at a conclusion opposite that of the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision constitutes an "unreasonable application" of federal law when the court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the case. *Id.* at 413. "For a state court's factual determination to be unreasonable under [section] 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston*, 592 F.3d at 554 (citation omitted). Ultimately, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Williams*, 529 U.S. at 386-89. Under AEDPA deference, the Court will focus on "the state court decision that previously addressed the claims rather than the petitioner's freestanding claims themselves." *McLee v. Angelone*, 967 F. Supp. 152, 156 (E.D. Va. 1997).

### 2. Ineffective Assistance of Counsel

To review ineffective assistance of counsel claims, the Court must apply "a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, __ U.S. __, 134 S. Ct. 10, 13 (2013) (quotation omitted). The applicable standard set forth in *Strickland* requires petitioner to show that his defense counsel provided assistance that (1) fell below an objective standard of reasonableness and (2) prejudiced petitioner as a result. *Strickland*, 446 U.S. at 700. To establish that counsel's performance fell

14

below an objective standard of reasonableness, petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In doing so, petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, petitioner must demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This requires petitioner to establish "probability sufficient to undermine confidence in the outcome," rather than a mere showing that "the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693-94.

## C.   Conclusions of Law

For the reasons stated below, the Court concludes that the state habeas court's decision[6] did not involve an unreasonable application of the *Strickland* standard or rest upon an unreasonable factual determination.[7]

### 1.   Claim 1: Failure to Properly Object to Medical Expert Testimony

Before addressing the merits of Stoffa's first claim, the Court must decide whether it comprises one or two separate ineffective assistance of counsel claims. In claim 1, Stoffa

---

[6] The Court will "look through" the Supreme Court of Virginia's summary refusal of Stoffa's state habeas petition for appeal and evaluate the reasoned decision of the Circuit Court for the City of Newport News. *Grueninger v. Dir., Virginia Dep't. of Corr.*, 813 F.3d 517, 525 (4th Cir. 2016); *see Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

[7] The Court also holds that the state court decision was not contrary to clearly established law because it did not arrive at a "conclusion opposite that of the Supreme Court on materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. The parties do not appear to contest this point.

contends that "trial counsel rendered ineffective assistance when they[8] failed to properly object to crucial portions of the testimony of the Commonwealth's two principal medical experts that were inadmissible under the confrontation clause and Virginia law."[9] ECF No. 1 at 16-17. Respondent contends that claim 1 should be considered as two separate claims. ECF No. 7 at 18-19. The Court agrees.

The state habeas court considered Stoffa's claims as to each expert to be separate claims of ineffective assistance of counsel and supported its analysis with a citation to *Lenz v. Warden*, 593 S.E.2d 292, 305 (Va. 2004), a case in which the court rejected the petitioner's individual ineffective assistance of counsel claims and then refused to find that the cumulative effect of trial counsel's actions and omissions prejudiced him. ECF No. 1-1 at 22-23. While Stoffa contends that the reasoning in *Lenz* does not apply to the present case because claim 1 is a single claim, the Court disagrees. Claim 1 encompasses allegations that trial counsel did not properly object or object at all, at two different times, to the trial testimony of two distinct experts. By combining these allegations into one claim, Stoffa invites the Court to consider the cumulative impact of trial counsel's omissions. However, "it has long been the practice of this Court . . . to assess claims under *Strickland*" one at a time. *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998). Because the claim that trial counsel did not *properly* object to Dr. Gunther's testimony is distinct from the claim that trial counsel did not object, at all, to Dr. Clayton's testimony, the

---

[8] The record reflects that Stoffa was represented at trial by two attorneys: Shawn M. Cline, Esq., and Mark T. Del Duca, Esq.

[9] While the record reflects that trial counsel objected to Dr. Gunther's testimony on hearsay grounds, Trial Tr. 180:7-11, Stoffa's mention of "Virginia law" refers to his argument that counsel should have made a separate objection based on the Virginia evidentiary rule "that expert opinion testimony in criminal cases may not be based on facts not in evidence." *Corado v. Commonwealth*, 623 S.E.2d 452, 458-59 (Va. Ct. App. 2005).

Court will examine each assertion individually. Nonetheless, even if considered cumulatively, trial counsel's omissions with respect to the two medical experts did not constitute deficient performance or result in prejudice.

### a. Failure to Properly Object to Dr. Gunther's Testimony

The state habeas court found that Stoffa failed to establish an ineffective assistance claim relating to the testimony of Dr. Gunther. With respect to the performance prong, the state habeas court found that trial counsel had objectively reasonable reasons for not objecting on Confrontation Clause or Virginia evidentiary law grounds to Dr. Gunther's testimony because Stoffa's defense was based partly on lack of intent to harm and Dr. Gunther's testimony did not address intent. ECF No. 1-1 at 23. The state habeas court also reasoned that Stoffa was not prejudiced by trial counsel's failure to object on Confrontation Clause or Virginia evidentiary law grounds because there was no evidence that the conclusions Dr. Gunther reached were not her own. *Id.* at 25. Dr. Gunther's own autopsy findings, independent from those of the neuropathologist, revealed bruising, multiple impacts, scar tissue, brain swelling, and retinal hemorrhages, which, according to the state habeas court, independently supported her opinion that inflicted brain injury caused A.C.'s death and gave her a sufficient basis to respond to cross examination questions about the autopsy exam. *Id.* at 25-26. The state habeas court further concluded that, had trial counsel been successful in excluding Dr. Gunther's testimony regarding the fine details of A.C.'s deep brain injuries, Dr. Clayton's testimony alone was sufficient to show that A.C. suffered abusive head trauma. *Id.* at 26-27. In addition, the state habeas court reasoned that the overwhelming evidence of Stoffa's failure to seek medical attention for A.C. constituted a sufficient basis for his convictions, as documented by the evidence of Stoffa's neglect and Dr. Clayton's testimony about the survival rate of children with inflicted traumatic

brain injury who receive medical treatment. *Id.* at 27. Lastly, the state habeas court suggested that the portions of Dr. Gunther's testimony related to the findings of the forensic anthropologist did not prejudice Stoffa because such testimony, concerning old head trauma and arm fractures that did not cause A.C.'s death, was not material to Dr. Gunther's conclusion that A.C. died of an inflicted brain injury of recent origin. *Id.* at 27-28.

Stoffa argues that the state habeas court's decision was unreasonable because it (1) classified trial counsel's failure to object to Dr. Gunther's testimony on Confrontation Clause or Virginia evidentiary law grounds as a tactical decision and (2) stated that Dr. Gunther did not base her conclusions on other experts.[10] ECF No. 1 at 27-28. As an initial matter, the Court notes that Stoffa's argument misapplies section 2254(d)(1). The unreasonable application clause must be applied to the state court's conclusion (that is, trial counsel was not ineffective), rather than the reasoning used by the state court to reach its conclusion. *See Gill v. Mecusker*, 633 F.3d 1272, 1291 (11th Cir. 2011) (stating that the Supreme Court "confirmed in *Harrington v. Richter* [562 U.S. 86 (2011)], that the 'precise question' that must be answered under the AEDPA standard must focus on [the] state court's ultimate conclusion"). Stoffa's argument invites the Court to scrutinize the reasoning applied by the state court rather than the ultimate decision,

---

[10] In this regard, Stoffa argues that the habeas court's ruling "unbelievably found that Dr. Gunther 'did not base . . . any of her conclusions on the report' of the other experts." ECF No. 1 at 28. The state court actually stated that "[a] careful review of Dr. Gunther's testimony demonstrates that she actually did not base all or even any of her conclusions on the report of the neuro-pathologist as Petitioner suggests." ECF 1-1 at 24-25. Although perhaps expressed in an overbroad fashion in light of Dr. Gunther's testimony that she based her report on the neuropathologist's report by consulting and using it when preparing her own report, Trial Tr. 181:6-13, 189:15-17, the Court interprets this sentence to mean, consistent with the entire state habeas court's ruling, that the conclusions Dr. Gunther testified to at trial were her own. This conclusion is well-supported by the record for the reasons discussed in this opinion.

which is not this Court's function. *See Brady v. Pfister*, 711 F.3d 818, 827 (7th Cir. 2013) (stating that, under *Richter*, "it is clear that a bad reason does not necessarily mean that the ultimate result was an unreasonable application of established doctrine" because a state court "could write that it rejected a defendant's claim because Tarot cards dictated that result, but its decision might nonetheless be a sound one"); *Clements v. Clarke*, 592 F.3d 45, 56 (1st Cir. 2010) ("It is the result to which we owe deference, not the opinion expounding it."); *Rashad v. Walsh*, 300 F.3d 27, 45 (1st Cir. 2002) ("It is not our function . . . to grade a state court opinion as if it were a law school examination."). The focus must be on whether the state court unreasonably applied the *Strickland* standard in concluding that trial counsel was not ineffective. For the following reasons, the Court finds that the state court's decision did not involve an unreasonable application of either prong of *Strickland*.

Trial counsel did not perform ineffectively by refraining from objecting to Dr. Gunther's testimony on Confrontation Clause grounds because they had ample grounds to doubt that such an objection would have been successful in excluding her testimony. Generally, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). At the time of Stoffa's trial, on May 25-26, 2011, the seminal Confrontation Clause case concerning forensic evidence was *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009). In *Melendez-Diaz*, the state trial court admitted sworn certificates of analysis into evidence, which showed that "material seized by the police and connected to the defendant was cocaine," without the testimony of the analysts. *Id.* at 307. The Supreme Court held that these sworn certificates of analysis were testimonial and subject to the Confrontation Clause and, thus, were inadmissible

19

unless the defendant had an opportunity to confront the analysts at trial or it was shown they were unavailable and the defendant had an opportunity to cross-examine them before trial. *Id.* at 310-11. As illuminated by the dissent, the majority's holding in *Melendez-Diaz* did not clarify which analyst must be confronted if multiple people were to play a role in a forensic analysis. *Id.* at 332. While the majority did not directly address this issue, it noted that its holding did not mandate that every person who had some role in performing the forensic analysis or who "laid hands on the evidence" testify at trial. *Id.* at 311 n.1.

At Stoffa's trial, unlike in *Melendez-Diaz*, the medical examiner who conducted A.C.'s autopsy, and who removed and examined specific bones and her brain for purposes of further analysis, testified and the defense received a full opportunity to confront her testimony. During the course of the examination, neither of the subsidiary reports utilized by the medical examiner in assembling her own report and testimony were admitted into evidence. Thus, leaving aside for a moment the tactical question of whether Stoffa's defense would have been well-served by challenging the cause of death in a case involving extensive evidence of the abuse of *two* children, *Melendez-Diaz* did not speak to the open question of whether such an objection would have been well-taken on these facts.

Approximately one month after Stoffa's trial, the Supreme Court revisited the subject of forensic evidence and the Confrontation Clause in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), which presented the narrow question:

> whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification.

*Id.* at 652. The Supreme Court held that it did not and ruled that the Confrontation Clause prohibits an analyst from testifying about a report completed by another analyst when the testifying analyst neither participated in nor observed nor reviewed the other's analysis and there was no claim the testifying analyst had an "independent opinion" concerning the forensic testimony.[11] *Id.* at 655. Although Stoffa purports to rely on *Bullcoming* to support his petition, there is no resemblance between the testimony of the analyst there and that of Dr. Gunther. Unlike the former, who had no connection to the test at issue, Dr. Gunther conducted A.C.'s autopsy and not only removed and examined suspect bones and A.C.'s brain and sent them on for further analysis, but she also reviewed slides of brain tissue, actively reviewed the analyses of the experts she consulted, and used those analyses in forming her own independent opinions.[12]

---

[11] In her separate concurring opinion, Justice Sotomayor highlighted the fact that *Bullcoming* was "not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal . . . connection to the scientific test at issue." *Bullcoming*, 564 U.S. at 672-73.

[12] In this regard, the Court rejects Stoffa's contention that Dr. Gunther was unable to render an opinion without the neuropathologist's assistance. ECF No. 8 at 3-4 ("Dr. Gunther's testimony makes clear that she based her ultimate conclusion as to A.C.'s cause of death on the neuropathologist's observations and conclusions . . . ."). In fact, the trial transcript shows that, in the questions leading up to providing her opinion that A.C. died of an inflicted brain injury, Dr. Gunther extensively reviewed her own, independent findings that supported that conclusion, without reference to the deeper brain injuries discovered upon further examination. Trial Tr. 172:15-188:4 (noting multiple bruises on forehead, right parietal bruise, at least 15 impacts to the head, bruises on the left ear, cheek, and around the jawline, bruises on the back, hemorrhage near the right buttock, 15 overlapping ovals of injury inside the head, an irregular area on the right parietal bone, skull separation due to brain swelling, an extensive subdural hematoma that "coats the brain" and is not seen in a normal brain, a "badly swollen brain," scar tissue on back and scalp, evidence of old bleeding as indicated by iron staining, extensive retinal hemorrhaging "from acceleration [and] deceleration," extensive old blood in the optic nerves not present in normal circumstances). *After* expressing her opinion on the cause of death, Trial Tr. 188:18-25, Dr. Gunther then testified about how the deeper brain injuries observed by her and the neuropathologist also supported the same conclusion that A.C., and her brain, had been subjected to violent forces inconsistent with the typical ways in which a child is injured. Trial Tr. 189:12-191:17.

Thus, unlike the surrogate witness found wanting in *Bullcoming*, *Id.* at 661, Dr. Gunther was fully able to convey what she "knew" and "observed" and was confronted about the same. Accordingly, even if it had been decided before Stoffa's trial, *Bullcoming*'s holding would not have compelled the conclusion that Dr. Gunther's testimony was inadmissible.

Finally, the most recent Supreme Court case to address forensic evidence, *Williams v. Illinois*, 132 S. Ct. 2221 (2012), further suggests that the application of the Confrontation Clause to Dr. Gunther's testimony is less than clear. In *Williams*, an expert sent biological samples found on the victim to an outside laboratory for DNA testing. *Id.* at 2229. The outside laboratory sent back a report containing a DNA profile, which the expert then matched to a profile of the petitioner previously produced by the expert's own lab. *Id.* At trial, the expert relied on the DNA profile produced by the outside laboratory to confirm that the DNA found on the victim statistically matched the DNA of the petitioner. *Id.* at 2229-30. The DNA profile produced by the outside laboratory was not admitted into evidence and the expert confirmed that she did not have personal knowledge of the analysis that led to the creation of the DNA profile. *Id.* at 2230. In *Williams*, a divided Supreme Court found no Confrontation Clause violation from the admission of expert testimony based on the report of a non-testifying DNA analyst. Because the judgment in *Williams* was not supported by a rationale that five justices agreed upon, however, no new rule of law emerged from this decision. Nonetheless, its holding suggests that, at least in some limited circumstances, a testifying expert may rely upon the report of another expert in the course of testifying. The procedure Dr. Gunther followed in the present case (that is, relying on two reports that were not admitted into evidence) mirrors the procedure the Supreme Court later authorized in *Williams*.

22

Nevertheless, even if *Bullcoming* or *Williams* would render Dr. Gunther's testimony inadmissible today, "counsel is not ineffective for failing to predict the development of the law." *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 288 (6th Cir. 2010); *see also Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) (stating that the "case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law"). This is particularly true when the case law addressing the admission of forensic evidence remains somewhat uncertain and nuanced even today. *See Williams*, 132 S. Ct. at 2254 (Breyer, J., concurring) ("I believe the question [raised in this case is] difficult, important, and not squarely addressed either today or in our earlier opinions."). For these reasons, the absence of a Confrontation Clause objection to Dr. Gunther's testimony does not establish that counsel rendered ineffective assistance.

Furthermore, trial counsel acted reasonably in not making a Virginia evidentiary law objection. In *Jones v. Commonwealth*, 677 S.E.2d 61, 65 (Va. Ct. App. 2009), the Court of Appeals found expert opinion testimony as to the cause of a victim's death admissible, notwithstanding the expert's reliance on medical records not in evidence, because her opinions were supported by her own observations and examinations of the victim's body. As in *Jones*, Dr. Gunther personally performed an autopsy examination of A.C. and testified in great detail about the injuries she observed that were consistent with abusive head trauma, including at least fifteen overlapping bruises on A.C.'s head, new and old bruises on her face, back and neck, brain swelling caused by an extensive subdural hematoma, and retinal hemorrhages showing old and new blood. Trial Tr. 174:23-184:2. The Court rejects Stoffa's contention that the findings of the forensic anthropologist and neuropathologist were essential to Dr. Gunther's conclusion that A.C. died from abusive head trauma. In fact, to the extent that Dr. Gunther relied on the report

23

of the forensic anthropologist to determine that A.C. had fractures in her left forearm, such a finding was irrelevant to her ultimate conclusion that A.C. died from abusive head trauma.[13] While Dr. Gunther may have used the report of the neuropathologist to further her understanding of the full extent of A.C.'s brain injuries, her personal observations of A.C.'s extensive head bruising and her independent examination of A.C.'s brain and slides of her brain tissue independently supported her conclusion.[14] Accordingly, trial counsel could have reasonably decided that her testimony did not run contrary to Virginia evidentiary law and that an objection on this ground would be futile.

In addition, even if trial counsel had successfully objected based on the Confrontation Clause or Virginia evidentiary law, failure to do so does not automatically equate to deficient performance. *See Humphries v. Ozmint*, 397 F.3d 206, 234 (4th Cir. 2005) ("Indeed, it is well established that failure to object to inadmissible or objectionable material for tactical reasons can

---

[13] Indeed, on cross-examination, in response to counsel's question whether "other factors . . . could lead to" the injuries observed in A.C.'s arm other than child abuse, Dr. Gunther testified that "[t]here are always other situations which can lead to that type of fracture." Trial Tr. 203:2-6.

[14] The Court also rejects Stoffa's claim that the "neuropathologist's findings led Dr. Gunther to conclude that [A.C.'s brain trauma resulting in death likely occurred] within two or three days before A.C. was brought to the hospital," within a time frame when there was "very little opportunity for anyone other than [Stoffa] to have inflicted the traumatic brain injury . . . ." ECF No. 1 at 23. When asked about when A.C. experienced the shaking episode that resulted in her death, Dr. Gunther acknowledged that she could not be precise, and it was apparent from her testimony that she was testifying from her own personal knowledge and experience. Trial Tr. 192:7-193:18 ("I can't give an exact number of days. I can say it definitely wasn't the minute before she was admitted to the hospital, and it definitely wasn't weeks before. Certainly three to six [days] is within the possible range, but I can give no exact number."), 196:14-197:22. Also, she readily conceded that she did not know who inflicted A.C.'s injuries. Trial Tr. 196:13-197:3. Further, to whatever extent she narrowed the window of opportunity, Dr. Gunther's testimony was wholly consistent with other evidence of record, including Stoffa's own statements to the emergency room doctor that A.C.'s unusual symptoms began a day or two earlier, when she collapsed on him. Trial Tr. 149:1-3.

constitute objectively reasonable trial strategy under *Strickland.*") (citations omitted). The Court rejects Stoffa's contention that trial counsel's failure to object on Confrontation Clause or Virginia evidentiary law grounds cannot be excused as trial strategy. Trial counsel might reasonably refrain from raising an issue in order to pursue alternative strategies or avoid antagonizing the judge or the witness. *See Melendez-Diaz*, 557 U.S. at 328 n.13 ("We simply do not expect defense attorneys to believe that their clients' interests (or their own) are furthered by objections to analysts' reports whose conclusions counsel have no intention of challenging."). Stoffa asks the Court to assume that trial counsel made decisions because they "simply did not know the law," but to do so would run contrary to *Strickland*'s mandate, which requires courts to "strongly presume" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. When confronted with substantial evidence, including extremely damaging admissions made by their client indicating that both A.C. and Y.C. were physically abused and that A.C.'s need for medical treatment was neglected, counsel may have reasonably decided not to contest testimony about A.C.'s cause of death. Instead, as reflected in the record, and as noted by the state habeas court, counsel appeared to focus the defense on Stoffa's alleged lack of intent to injure and on suggesting that someone else was responsible. For these reasons, the state habeas court did not unreasonably apply the performance prong of *Strickland* by concluding that counsel did not render deficient performance.

Nor did the state habeas court unreasonably apply the prejudice prong of *Strickland*. Stoffa contends that had trial counsel objected to Dr. Gunther's testimony on Confrontation Clause or Virginia evidentiary law grounds, "there is much more than a reasonable probability the outcome of the trial would have been different." ECF No. 1 at 27. The Court disagrees.

25

First, Stoffa has not convinced the Court that trial counsel could have eliminated the medical evidence establishing A.C.'s cause of death with a successful objection to Dr. Gunther's testimony on Confrontation Clause or Virginia evidentiary law grounds. Second, even if trial counsel had successfully eliminated the parts of Dr. Gunther's testimony related to the work performed by the neuropathologist and forensic anthropologist, there is ample evidence to suggest that Dr. Gunther actually reached the same conclusion based on her own independent findings from A.C.'s autopsy. Third, the trial court cited multiple reasons for finding Stoffa guilty in addition to the medical expert testimony, including Stoffa's admissions, overall lack of credibility, and "callous disregard for the life of A.C." Trial Tr. 459:7-462:11. At trial, the court heard testimony that Stoffa admitted to shaking A.C. fifteen times as hard as an adult. Trial Tr. 299:15-17. The court also heard Stoffa himself detail what can only be described as abusive conduct, including forcing the children to stay in bed all day as time outs, slapping, force feeding, and failing to obtain medical care for A.C., despite observing symptoms such as loss of consciousness, projectile vomiting, lethargy, and bruising. Trial Tr. 378:5-10, 390:6-392:5, 398:16-399:1, 411:8-412:1. In fact, Stoffa testified that the first time he sought medical care for either one of the children was when A.C. was in the process of dying. Trial Tr. 384:18-20. While Stoffa continually attempted to minimize his responsibility for the children, he testified that he was with the children most of the time. Trial Tr. 387:3-25. The trial court also heard Stoffa's inculpatory statements made to the police, including that "he was 'completely responsible' for what happened to A.C., that he 'made her a vegetable,' and that he was guilty." Trial Tr. 300:18-301:6. In addition, Stoffa told the police that the children would have been safer never having known he existed. Trial Tr. 435:6-9. Stoffa now seeks to minimize these statements by insisting that "when [he] said he was 'responsible' it was clear from context that

he was claiming moral responsibility."[15] ECF No. 8 at 10. The trial court heard, and reasonably rejected, a similar argument at trial. Trial Tr. 377:1-22, 461:19-462:5. In light of the overwhelming evidence against Stoffa, there is simply no reasonable probability of a different outcome had trial counsel objected on Confrontation Clause or Virginia evidentiary law grounds to Dr. Gunther's testimony.

### b. Failure to Object to Dr. Clayton's Testimony

The state habeas court also determined that trial counsel was not ineffective in failing to object to Dr. Clayton's testimony. ECF No. 1-1 at 28. With respect to the performance prong, the state habeas court reiterated that counsel had an objectively reasonable basis not to object to Dr. Clayton's testimony because his defense focused on the theory that Stoffa did not inflict intentional injuries on A.C. *Id.* Further, the state habeas court declared that Dr. Clayton's testimony did not violate the Confrontation Clause. *Id.* The court explained that she "independently observed the autopsy and the photographs of A.C.'s injuries." *Id.* at 29. Because Dr. Clayton "did not rely upon Dr. Wyvill's testimonial statements, she did not testify as to Dr. Wyvill's conclusions, and her testimony was wholly proper." *Id.*

Stoffa argues that the state habeas court unreasonably applied *Strickland* by (1) classifying trial counsel's failure to object to Dr. Clayton's testimony as a tactical decision and (2) stating that "Dr. Clayton 'did not rely upon Dr. Wyvill's' work."[16] ECF No. 1 at 28-29. As discussed above, these arguments misapply section 2254(d)(1)'s unreasonable application clause

---

[15] The Court further disagrees that the context of Stoffa's statements suggests anything but that he was claiming full responsibility for A.C.'s injuries.

[16] The Court notes that this misstates what the state court actually stated, which is that "Dr. Clayton's testimony did not rely upon Dr. Wyvill's testimonial statements." ECF No. 1-1 at 29.

to the state court's reasoning. The Court will focus on the state habeas court's ultimate conclusion in determining whether it unreasonably applied the *Strickland* standard.

The state habeas court did not unreasonably apply the performance prong of *Strickland* by concluding that trial counsel acted reasonably in not objecting to Dr. Clayton's testimony. As discussed previously, trial counsel was free to pursue other strategies, regardless of whether an objection may have been successful. Even so, trial counsel could reasonably have decided that they had no legitimate basis to object to Dr. Clayton's testimony. Stoffa contends that Dr. Clayton's testimony violated the Confrontation Clause because it was based on the work of Dr. Wyvill, a non-testifying physician, who reviewed A.C.'s case. The Court rejects this argument. As discussed above, Dr. Clayton supervised Dr. Wyvill in her review of A.C.'s case, reviewed all photographs that Dr. Wyvill obtained during A.C.'s autopsy and any photographs provided by investigators, observed A.C.'s autopsy via video, reviewed Dr. Wyvill's report, and edited and revised its conclusions. Trial Tr. 208:21-209:2. Thus, Dr. Clayton testified to her firsthand knowledge and did not provide the kind of "surrogate testimony" of the kind later rejected by *Bullcoming*. Moreover, no Confrontation Clause violation occurred under *Melendez-Diaz* because *Melendez-Diaz* did not mandate that every person involved in forensic testing testify at trial. *Melendez-Diaz*, 557 U.S. at 311 n.1. Lastly, Dr. Clayton's testimony did not violate the Virginia rule on expert testimony because Dr. Clayton testified to facts within her personal knowledge and did not base her opinion on facts not in evidence. Trial counsel did not render deficient performance by not objecting on these grounds.

Furthermore, the state habeas court did not unreasonably apply the prejudice prong of *Strickland*. For the reasons noted above, the record contains overwhelming evidence that Stoffa

28

committed the crimes charged. Thus, there is no reasonable probability that the result of the trial would have been different had trial counsel chosen to object.

### c.  Determination of the Facts

Finally, Stoffa contends that the state habeas court's "failure to hold an evidentiary hearing and the state court's preventing [Stoffa] from developing the record was itself an unreasonable determination of the facts." ECF No. 1 at 29. A "'determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). In some circumstances, "the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under [section] 2254(d)(2)." *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). However, a "state habeas court need not hold an evidentiary hearing in every case to make reasonable fact determinations." *Gray v. Zook*, 806 F.3d 783, 792 (4th Cir. 2015), *appeal docketed*, No. 15-9473 (U.S. May 24, 2016). "A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Hibbler*, 693 F.3d at 1147. In other words, an "evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Id.* (quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)). In this case, the record is sufficient to enable a court to assess trial counsel's performance in relation to the testimony. Thus, no evidentiary hearing was necessary and the state habeas court did not make an unreasonable determination of the facts.

In conclusion, because the state habeas court's decision involved neither an unreasonable application of the *Strickland* standard nor an unreasonable factual determination, the Court

**RECOMMENDS** that each of Stoffa's claims of ineffective assistance of counsel with respect to expert testimony be **DENIED** and **DISMISSED WITH PREJUDICE**.

### 2. Claim 2: Failure to Obtain Medical Expert

After Stoffa's conviction, habeas counsel obtained an affidavit by Dr. John S. Daniel, M.D., declaring that A.C.'s cause of death may have been "non-homicidal" and "consistent with innocent causation," which Stoffa submitted in conjunction with his state habeas petition. ECF No. 1-4 at 19. Based on this report, Stoffa now contends that trial counsel was ineffective for not retaining a defense expert to testify to A.C.'s cause of death. ECF No. 1 at 30. The state habeas court considered Dr. Daniel's affidavit, but concluded that Stoffa had failed to satisfy either prong of the *Strickland* test. ECF No. 1-1 at 29. The state habeas court premised its view that counsel was not deficient on the fact that Dr. Daniel "did not aver that he had taken into account [Stoffa's] trial testimony and statements to police in reaching his conclusions as to the cause of [A.C.'s] injuries." *Id.* at 29-30. The state habeas court also found no prejudice where the Commonwealth's experts testified at trial "unequivocally that A.C.'s death was caused by abusive head trauma" and specifically denied the suggestion, renewed by Dr. Daniel, that ingestion of soap was sufficient to cause A.C.'s injuries. *Id.* at 30. Lastly, the state habeas court listed Stoffa's admissions, including that he shook A.C. as hard as an adult at least fifteen times and did not obtain appropriate medical care for A.C. after observing critical symptoms of mental and physical distress, as further evidence that the result of the trial would have been the same, regardless of whether trial counsel called an expert like Dr. Daniels. *Id.* at 30-31.

Stoffa contends that the state habeas court unreasonably applied *Strickland* by premising its denial of Stoffa's deficient performance claim on the fact that Dr. Daniel failed to consider Stoffa's admissions in reaching his opinion, which, Stoffa contends, "turns over twenty years of

improvements in the forensic sciences on its head by, in effect *requiring* confirmation or contextual bias." ECF No. 1 at 32-33. Once again, Stoffa's argument misapplies section 2254(d)(1)'s unreasonable application clause to the state court's reasoning, rather than its ultimate conclusion. While the Court does not find all of the state habeas court's reasoning persuasive, it is only the result to which a federal court owes deference. *See Clements*, 592 F.3d at 56. In this case, the Court finds that the state habeas court's conclusion did not involve an unreasonable application of either prong of *Strickland*.

Objectively reasonable strategic reasons existed for trial counsels' choice to omit a defense medical expert. In *Burr v. Lassiter*, 513 F. App'x 327, 329 (4th Cir. 2013), a recent child abuse habeas case, the Fourth Circuit reconsidered the district court's grant of the federal habeas petition Burr filed following his convictions for capital murder and felony child abuse of his four-month-old daughter. In his petition, Burr argued that counsel was ineffective in failing to present expert testimony that his daughter's death was caused by accidental injury. *Id.* at 336. On appeal, the Fourth Circuit rejected Burr's argument and reversed the district court. The Court found Burr's counsel satisfied the performance prong of *Strickland*, in part, because he pursued an "alternative-perpetrator, reasonable-doubt defense that was consistent with the factual investigation and the overwhelming medical evidence that [the child] was a victim of child abuse." *Id.* at 344-45.

Like in *Burr*, Stoffa's trial counsel formulated a reasonable trial strategy, focused on a multi-pronged defense, by pursuing, in part, a blame-shifting defense rather than contesting the cause of death. [17] Examination of the trial record reveals that a significant part of trial counsel's

---

[17] The record reveals that trial counsel pursued simultaneous strategies: to shift blame to Callender and to show that Stoffa did not have the requisite intent to harm the children. The two

strategy was to shift blame and responsibility to Lillian Callender, the child's mother. *See* Trial Tr. 456:16-20 ("He, unfortunately, deferred to the judgment of the child's biological mother."). Trial counsel attempted to minimize Stoffa's role in the family by remarking that he was not A.C.'s biological father. *See* Trial Tr. 26:14-18 ("He is not their father, he is not their guardian, he did not adopt these children, he was simply the boyfriend of Lillian Callender, with whom [A.C.] happened to live at the time."). Furthermore, trial counsel attempted to shift blame to Callender for Stoffa's failure to take the children to the hospital by eliciting testimony suggesting that Stoffa wanted to take A.C. to the hospital, but deferred to Callender's decision not to do so. Trial Tr. 367:6-18, 436:9-25. Trial counsel also elicited testimony from Stoffa that he force fed A.C. in an attempt to help because Callender was ignoring the children and letting them starve. Trial Tr. 441:23-442:15.

Stoffa now argues that trial counsel should have obtained an expert to testify that A.C. died of natural causes. ECF No. 1 at 32. However, in light of the overwhelming evidence that A.C. and her sister were victims of child abuse, trial counsel acted reasonably in pursuing an alternative strategy. "Rare are the situations in which 'the wide latitude counsel must have in

---

strategies appear interconnected. Trial counsel relied on the premise that Callender was the party truly responsible for A.C.'s injuries to strengthen the argument that Stoffa's actions stemmed, not from a desire to harm A.C., but rather from a desire to defer to the mother's direction. In the state habeas court's discussion of a claim Stoffa did not present on federal habeas review, the court indicates that trial counsel refrained from eliciting information about Callender's suspicious behavior following A.C.'s death because shifting blame to Callender could have prompted the Commonwealth to call Callender as a witness, who would then have provided incriminating testimony against Stoffa. ECF No. 1-1 at 11. This Court's own review of the trial transcript reveals that trial counsel did indeed try to shift blame to Callender, though in a somewhat subtle way. Without accusing Callender outright of harming the children, trial counsel repeatedly emphasized Stoffa's mere deference to Callender's misguided direction. Trial Tr. 367:6-18, 436:9-25, 456:16-23. In doing so, it appears trial counsel tried to depict Callender as the responsible party, but withheld outright accusations in order to keep her off of the witness stand.

making tactical decisions' will be limited to any one technique or approach." *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). Because there is certainly a "reasonable argument that [trial] counsel satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105, the state habeas court did not unreasonably apply the performance prong of *Strickland*.

The state habeas court also reasonably applied the prejudice prong of *Strickland* by concluding that Stoffa failed to show that, but for counsel's errors, the result of the trial would have been different. ECF No. 1-1 at 30. The trial court rejected trial counsel's strategy of shifting blame to Callender. With the benefit of hindsight, Stoffa argues now that "with an independent expert's opinion that death was by natural causes, there is a reasonable probability that [Stoffa] would not have been convicted of second degree murder." ECF No. 1 at 32.

In post-conviction proceedings, "the stakes are high, and it is all too tempting for post-conviction counsel, with the benefit of hindsight, to second-guess the investigative decisions of trial counsel." *Burr*, 513 F. App'x at 346. Stoffa questions the strategy of his trial counsel, but he has not convinced the Court that the alternative strategy he now proposes would have been more successful. In light of the overwhelming evidence that A.C. was a victim of Stoffa's child abuse, including Stoffa's own admission that he shook A.C. fifteen times as hard as an adult, trial counsel could have risked a loss of credibility by focusing on the theory that A.C. died of natural causes. This is particularly true where there was evidence that both A.C. and her sister, Y.C., had been abused. *See id.* ("Indeed, it takes little effort for us to imagine a converse case—where post-conviction counsel would criticize trial counsel's decision to risk credibility by advancing a speculative osteogenesis imperfecta/accidental death theory that would blame [the child's] injuries upon her 8-year-old brother in direct contradiction to the opinions of the physicians, pediatric specialists and child abuse experts who treated and evaluated her."). In light of the fact

that any natural cause of death theory would have been strongly challenged by the Commonwealth's experts and was, in certain respects already addressed by them, and in view of the overwhelming evidence of guilt, including Stoffa's own admissions and inconsistent statements, there is not a "probability sufficient to undermine confidence in the outcome" such that the result of the proceeding would have been different. *Strickland*, 446 U.S. at 693-94. Accordingly, the Court concludes that the state court did not unreasonably apply the prejudice prong of *Strickland*.

Lastly, Stoffa maintains that the state habeas court unreasonably determined the facts because the state court found the testifying medical experts, Dr. Gunther and Dr. Clayton, more credible than Dr. Daniel without holding an evidentiary hearing. The Court is mindful that where "'the state court has before it, yet apparently ignores, evidence that supports [the] petitioner's claim,' the state court fact-finding process is defective." *Moore v. Hardee*, 723 F.3d 488, 499 (4th Cir. 2013) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). Here, however, no defect exists because the state habeas court did not ignore Dr. Daniel's affidavit. Rather, it considered Dr. Daniel's affidavit and discounted it because Dr. Daniel failed to consider Stoffa's admissions when forming his expert opinion. ECF No. 1-1 at 29-31. Therefore, the state habeas court did not make an unreasonable determination of the facts.

In sum, the state habeas court did not unreasonably apply the *Strickland* standard or make an unreasonable factual determination. The Court, therefore, **RECOMMENDS** that Stoffa's claim 2 be **DENIED** and **DISMISSED WITH PREJUDICE**.

### III.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 5, be **GRANTED**, and the petition for a writ of habeas corpus, ECF No. 1, be **DENIED** and **DISMISSED WITH PREJUDICE.**

### IV.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

35

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
July 8, 2016

36